Morning. James Harris for Appellants. There are too many issues to argue here, so my intention is to focus initially on the new trial issues that affect the compensatory verdict against both defendants, then focus on the new trial issues that affect the punitive award against EPSG, unless this Court has questions on other issues. The fundamental issue that affects the entire award, compensatory and punitive, is the trial court's decision under Rule 403 to exclude all evidence of the workers' comp settlements and amounts. The trial court did so because she was concerned that admitting any information on the settlement amounts would induce the jury not to award damages. What the trial court overlooked was that the evidence about workers' comp settlement amounts was relevant not only to damages, but was critically relevant to both liability and punitive damages, reprehensibility and malice. And it was relevant to those issues because plaintiffs made it relevant. Plaintiffs' theory of the case was that the defendants had a financial incentive to injure their senior workers and put them on workers' comp, that it was cheaper for the companies to do that. I'm not sure that's only plaintiffs' theory. That's in the evidence of what some of your people put in their e-mails. I want these guys to go out on disability. Well. That's your evidence. That's your witness. Well, here's my point, Your Honor. In many respects, this was a he said, she said case. They put in evidence that Mr. Leighton had directed that senior workers get more arduous assignments in order to get them injured. We put on a slew of evidence that was directly contrary to that. Mr. Leighton denied that. The supervisors and managers who actually assigned work all testified that they were given no such instruction and they never did anything along those lines. So the point is that in many respects, the evidence as to whether discriminatory acts occurred and whether they were motivated by age turned on the existence of the incentive that the plaintiffs attributed to the defendants. And in closing argument, the plaintiffs strongly argued that the evidence was on both sides. They said their evidence was better and they said the reason why you should conclude our evidence is better, why you need to decide who's telling the truth, what you should look at is the defendant's financial motive to injure these workers. And the problem was the best and strongest, indeed, the only evidence that the defendants could introduce to demonstrate that this incentive was irrational from their point of view was evidence that a single substantial workers' comp claim could blow the entire work comp budget and therefore the defendants had no such incentive. The jury had no idea that such evidence existed. The jury had no idea. Let me understand as best I can the evidence that you would have introduced. Yes. And its overall effect. Yes. You say they would have produced evidence and I know more or less what you're saying, I believe what you're going to say. Yes. It was going to blow the entire work comp budget. Yes. Well, okay, so they blow the entire work comp budget, which was what? For the fiscal year in questions about 300, 320, something like that, low 300. And so how much money would the company, your company, have saved even taking that into account by getting these guys off the payroll? Well, they wouldn't have saved anything. I mean, take a look at Mr. January, for example. What's the evidence you would have introduced on that point? The evidence we would have introduced is the company spent over $500,000 paying workers' comp claims for the six plaintiffs, paid roughly $300,000 for Mr. January alone. The differential between a senior worker and a junior worker is only $10,000 a year. So it doesn't make any sense to spend $300,000 on a particular claim to try to save a little bit of money by hiring a replacement that's going to save you $10,000. It doesn't make any sense. But you can't make that argument without being able to put in the amount of money that it costs for a substantial claim. Without that, the jury is just going to be left to infer that if anything was paid by the defendants, it was a minimal amount. As the plaintiffs continued to assert in, continually asserted in closing argument. They kept saying the defendants viewed workers' comp as a minor thing, a drop in the bucket, nothing. That's why you should believe their testimony, they said. That's why you should believe that the incentive existed. Well, $300,000 for a particular claim is not minor. It's not a drop in the bucket. It's a substantial amount of money that no manager would ever intentionally incur. It doesn't make any sense. But the jury was prohibited from finding out about that. And that was an error that infected the entire verdict, both compensatory and punitive. I submit that if that evidence had come in, there's a very strong likelihood that, well, the plaintiffs wouldn't have been able to make the closing argument that they made. And I think there's a very strong likelihood that they would have viewed the disparate factual stories quite differently. They could have very easily come out on our side. So I think that's the threshold issue. And if you agree with us on that, we're entitled to a new trial on everything. We also, with respect to the compensatory award, we briefed two issues with respect to the components of the award. We argued that the lost income award, the $144,000, is impermissible because it was based on an expert report that was based on assumed facts, and the assumed facts were never put into evidence. And the $800,000 emotional distress award is inappropriate because the judge ruled that Mr. January couldn't recover for his depression, but then allowed him to testify in graphic detail about all the effects of his depression. And that's the only emotional distress testimony that was put in. That's the only emotional distress argument that was made to the jury. I think those issues are fully briefed, and I don't intend to say anything else about them except to put them in context. The context is Mr. January's entire award, compensatory award, was $1,047,000. That was his judgment. The $800,000 for emotional distress and the $144,000 for lost income comes to roughly $950,000. That's 90% of his award. If you reach this issue and you agree with us, his award basically at most comes down to about $125,000 or $150,000 compensatory, and that means under settled law that the punitives have to come down in commensurate amount as well. So I know frequently these kind of issues are sort of viewed as less important than some of the other issues, but in the context of this case, given the numbers, they're really of critical importance. The next issue I want to talk about is the stipulation. The trial court concluded that the plaintiff was relieved of their obligation, rather, to demonstrate that DPSG was a statutory employer of them based on a stipulation that was contained in the pretrial order. What was the purpose of the stipulation? The purpose of the stipulation is- There were only two and you agreed to it, so what was the purpose? The purpose was to eliminate the plaintiff's obligation to prove that they were employees, not necessarily of Dr. Pepper, but that they had an employee relationship. And that was explained by defense counsel at the initial instruction conference, which occurred three or four days after the judge issued her orders, which was the first chance that defense counsel had an opportunity to explain the basis of the stipulation and why the district court had misread the stipulation. The stipulation was not intended to relieve the plaintiffs of their obligation of proving that Dr. Pepper was, in fact, the statutory employer. The defendant's position throughout- and this is the chronology that the district court seemed unaware of- the defendant's position throughout had been that DPSG was not a statutory employer. And if I could- Isn't that contrary to the plain wording of the stipulation? No, I don't believe it is. I think at best the stipulation is ambiguous. And given that it's ambiguous under well-settled California law, the trial judge was required to look to extrinsic evidence under California's parole evidence rule. The extrinsic evidence was quite clear that the defendant's position was the opposite of the way the judge was reading it. And there are three or four steps in the factual chronology that I'd just like to highlight. If you look at the removal papers, 10, 15, 20 different representations are made that Dr. Pepper was not, in fact, a statutory employer. It's stated in two declarations, it's stated in the papers, it's stated over and over again. Next event is on September 26th, the defendants propose their initial instructions. The defendants propose instructions, they decide the case separately as to each defendant. Then October 14th is the key event. Several things happen on October 14th, which make the judge's ruling absolutely incorrect. First, defendants again propose instructions saying decide the case separately as to each of them. Plaintiffs file their objections to the defendants' proposed instructions, and they say strike the word each defendant. There is only one defendant, the American Bottling Company. And then the parties sign and the parties submit this proposed order. At the pretrial conference, four days later, the defendants get up and say there should really only be one defendant. The only employer was American Bottling Company. Plaintiffs say, and I'm quoting, we don't have a dispute if the American Bottling Company, we don't have a dispute if the employer is American Bottling Company, that's fine, if that's the employer. A couple days later, plaintiffs refuse to dismiss DPSG, they get cold feet. And the defendants file a motion asking to enforce the plaintiff's representation that only ABC would be the employer. So on November 2nd, the district court does two things. First, it signs the proposed pretrial conference order, which contains the ambiguous stipulation I talked about. And then it denies the defendant's ex-party based in large part on the stipulation. So you've got the district court doing contradictory things at the exact same moment. On the one hand, it's saying, I'm going to deny the motion to have only one defendant. And then it's saying, and the parties stipulated that there would be two defendants, and they were each statutory employers. It doesn't make any sense to construe the stipulation in light of this history as Dr. Pepper having, DPSG rather, as DPSG having stipulated to relieve plaintiff of its obligation to prove that DPSG is a statutory employer. Then four days later -- Well, what's the purpose, then, of stipulating that the plaintiffs were employed by defendants plural? To eliminate their obligation to prove that they were employees at all. That was the -- Does that necessarily imply that they were employed by someone, and someone was identified in the stipulation, and there were two parties there? Yes. There were two parties there, and that -- Including DPSG. Look, I'm not -- And that's on your part? It was an artfully drafted stipulation. I certainly concede that. You said A plus B, but you didn't mean B? I mean, that's a pretty big typo. Well, but if you look at it, I mean, if you were to read the stipulation on its own with no other context, it's not irrational for the district court to reach the conclusion that it did. But you have all this context. On the exact same day, you've got the district court denying defendants' motion that there should only be one defendant. Defendants' position that there's only one defendant is before the judge the exact same moment she's construing this stipulation as saying there are two defendants. But that's a perfectly plausible way of reading the scenario, is you say the plaintiffs got cold feet. It seems to me that DPSG greatly regretted the stipulation that it had previously entered into. Well, I don't think so. I think it was an artfully drafted. I think it was, at best, ambiguous. And if you read it. A plus B, that's not very ambiguous to me. Well, but the next point in the analysis is four days later, defense counsel, the first opportunity to talk to the judge, they go to the judge. Trial counsel goes to the judge and says, this is not what we meant when we signed the stipulation. It's contrary to our entire position. It's contrary to all the evidence. You should relieve us from this stipulation. And there is well-settled law in this circuit, the McGregor case, and in the Fifth Circuit. So review the timing for me. Okay. The stipulation is entered into when. Okay. And when do defendants come in and ask to be relieved of the stipulation? Okay. October 14th, the stipulation is signed by the parties and submitted to the court. Several days later, defendants move to enforce the plaintiff's representation that there's only one defendant. November 2nd, the court denies that motion and signs the pretrial order. And she reads the pretrial order as containing a stipulation that forecloses defendant's motion. That's November 2nd. November 10th is the instructions conference. That's the initial instructions conference. That's the first time trial counsel is in front of the judge after she first construes the stipulation. And trial counsel explains it's not what we meant, but in any event, it's contrary to our position and it's unfair. DPSG is not a statutory employer and we should be relieved of the stipulation. And under well-settled law, the McGregor case from this court and the Rathbone case from the Fifth Circuit, if a stipulation is, would cause a miscarriage of justice, would be, is contradicted by substantial evidence, a party should be relieved from the stipulation. And that's the case here. If you look at, you know, we weren't allowed to put in a full-blown presentation on DPSG's relationship with these employees. But if you look at the evidence that's in the record. When you say getting back to the pretrial conference. Yes. Did you make a motion at the pretrial conference to be relieved? How did it come up? Comment? No, no. It was an extensive discussion. I know, I know. But did you say, all right, judge, we make a motion to be relieved of our stipulation? Did you say those words? I don't believe the word motion was used, but it is clear from. What word was used? Defense, trial counsel told the court that she had misread the stipulation and that it was contrary to DPSG's position and was unfair. And that it should be. What was the court's response? The court. Transcript? Yes, yes. What was the court's response? The court's response was that the stipulation governed. And then it, and that. At what point did you say, well, we want to be relieved of our stipulation? That was the sum and substance of the conversation. Did you say that? Those precise words, no. But that. She said it's governed by the stipulation. Did you say then that we want to be relieved of the stipulation? No. That was the clear implication of the entire discussion, Your Honor. But you never made such a motion. It was an oral motion. I think a fair reading of the transcript is that is exactly what trial counsel was asking for. And it was in the context of the initial discussion of the instructions, where we were urging the judge to instruct separately as to both defendants. And she said, I won't instruct separately as to both defendants because of the stipulation. Trial counsel said, well, that stipulation doesn't mean what you think it means. We're entitled to such an instruction. And trial counsel kept pushing for such an instruction. And on December 6th, trial counsel again asked for such an instruction, and the court refused based on the stipulation. And then in the post-trial order, the court said that it concluded that it was not a miscarriage of justice. And this is key. The court concluded it was not a miscarriage of justice to hold DPSG to the stipulation because DPSG had repeatedly told the court, according to the court, that it regarded itself as a statutory employer. And my point is the chronology that I outlined at the beginning of this section of the argument is directly contrary to the court's understanding, and she overlooked all those facts. Your time is just under two minutes. Would you like to save a little time? Thank you. I apologize. There are so many arguments in this case, I have to get the right ones up next. I apologize. Why don't you just go right to what Mr. Harris calls the overarching ruling that governs everything in this case. It's a 403 ruling excluding all evidence of workers' compensation settlements. Why wasn't that error? Why wasn't that ruling error and prejudicial and affected the verdicts? Well, it couldn't have been for a variety of reasons. First of all, it's important to note that there was direct evidence. Usually inferences, the battle of trying to infer conduct and intent that goes on in employment cases is required because there's no direct evidence, and so we have as a substitute a variety of shifting burdens, et cetera, that allow the jurors to draw inferences about conduct, and that's the kind of thing he's talking about. Well, when we did this and this and this, was it because we were trying to maximize finances or was it some other reason? In our case, as the judge pointed out in her order denying defendants' new trial and JML motions, there was a wealth of independent direct evidence of discriminatory intent. So the importance of the entire battle of inferences. That may be true, but that doesn't explain why the district court, if you had direct evidence, that suggests that you should win. It doesn't suggest why the defense doesn't get to put on its defense. Well, the defense, though, itself is irrational in a few different ways. First of all, the premise of it was the council kept on focusing on the huge size, the $289,000 award that went to Mr. January. By everything else in the record, that was an aberrationally high award. If you look at the five awards that went to the plaintiffs in this case, the other four totaled $200,000 altogether. I don't think you're addressing my question. Okay, I'm sorry. My question was why was the 403 ruling not erroneous because it excluded all of the defendants' evidence on workers' compensation settlement? It did not. Why should they be able to introduce that evidence? First of all, it did not exclude all of the workers' comp evidence by a long shot. There was a wealth of workers' comp evidence that came in with regard to historical amounts that were paid, et cetera. For example, Michael O'Leary testified on cross-by defendants that the state of the P&L for 2006 for the San Fernando branch showed that the actual year-to-date expense, meaning workers' comp expense, was $290,000, and the plan for the year was $183,000, and that the prior year at that point was $199,000. And also, in June of 2006, San Fernando was over its workers' comp budget by about $110,000, et cetera, et cetera. So there was a wealth of evidence about the workers' comp as part of their budget, et cetera. The one thing — Explain anything about the workers' comp that the plaintiffs got. No, no. The whole premise of their — the whole logic that they have there is that the defendants would not have purposely injured these people or done things to injure these people because they would have run up their workers' comp expenses. And they could make that argument, pointing out that they were already over budget, et cetera. They could make it better by introducing direct evidence that what they paid the plaintiffs,  I don't think — in this case, the only evidence we're talking about is the $289,000 amount, which, as I said, was total aberration. The average of the other four plaintiffs in this case was about $44,000, if you take the four of them and add and divide by four. So this $289,000 was off the charts. The most important thing, though, is that — But wouldn't that be relevant? That doesn't suggest that they win. It just suggests that they get to present it to the jury. Well — And you get to come back and you get to rebut it. No, it's not relevant for this reason. To the degree — it's arguing backwards. It's a hindsight argument. They're basically saying that because this amount — and counsel kept on stressing what a large amount this was, et cetera. They're saying because this amount was so large, obviously they wouldn't have had — actually, let me back up for a second. There's a fundamental point I forgot to make. The fundamental point — the fundamental point — I'm sorry, I'm working on limited sleep because my father died a few days ago and I've been cramming trying to get this argument together, so please bear with me if I'm not as focused as I would have otherwise liked to be. Did I help you focus? The fundamental point is that they're arguing backwards from the 289. They said this aberrationally high thing happened and we would not have — I remember the fundamental point. I'm sorry. The fundamental point is that their strategy, the memos that were introduced into evidence, et cetera, the direct evidence we talked about, was not that they set out to injure these people. The evidence showed that they set out to get older people to retire. And the plan was to move them out. And the plan was to make work as discouraging and hard and miserable and disheartening as they could. And then as a — Wait a minute. That's only half the argument. Now, the other half was get them to retire or put them on workers' comp. And this evidence is not to rebut people who are retiring but the people who went on workers' comp. Nothing to do with the retiring people. No, no. What they were trying to — they were trying to encourage older people. They were throwing hard jobs at them to make them want to quit. Right. And then they said if they don't quit — We're not — this question is not concerned with that part of the argument. It's concerned with the other part of the argument. Part of your case is, you know, they had this deliberate strategy of, one, making older people retire or putting them on workers' comp. And it suggests the workers' comp part of the argument, not the retirement part. No, the point was the actually having people seriously injured, like the $289,000 that he wanted to introduce, that was not — that was like collateral damage. The plan was create hard-working conditions. Make these people do physical things that are taxing that they haven't done before so they'll get discouraged and quit. And if they don't quit, maybe we'll be lucky. In that case — And the defense was, why would we do that when it costs us so much money? And they couldn't introduce evidence to back up that defense. They could introduce evidence that their workers' comp bills were already very high, et cetera. Now, the other problem is that this — Oh, but not with respect to these plaintiffs. But it's — Counsel, here's the problem. I want to jump onto this. Here's the other problem. All of the arguments that you are making might be supportive of a 403 ruling. They are not the arguments the district court made. The district court made one argument, which was there might be an accounting problem. It might be hard for the jury to deal with this. And that seems to be the only explanation the district court offered. No, the court specifically cited 403 concerns in her new trial motion. And I have — In the order denying motion for judgment as a matter of law and motion for new trial — I'm sorry, I don't have the ER site on this version. I've got ER 15. I'm looking at page 9, which is the exclusion of workers' compensation evidence. And there's a 4-0 — The court said that the court could — Right. The court agreed with the plaintiff's arguments to the extent defendants were entitled to any offset, the court could make the necessary deductions once the jury found liability. The court has made those deductions. But it says — she says it would have been unduly prejudicial, confusing, and a waste of time. Exactly. And let me — and so she had a chance in this order to fully revisit that decision. And she reaffirmed that that was part of her thinking as well. And that is part of her thinking for a few reasons. First of all, the only thing we're here to talk about is the 289,000 which came in for Mr. January. And as I said, that amount was far in excess of what anybody would have expected. So we're talking about a fluke that happened, and they wanted to ride that horse. Now, if they had known in advance that their conduct was going to produce a $289,000 hit, then maybe they would have had second thoughts about it. But that's very different. They're trying to argue backwards from the fact that after they went on their scheme of trying to drive these people out to quit and then maybe they'll get injured. But, again, getting — maybe they'll get injured might mean they'll have a $20,000 injury or $40,000 injury, which was the average injury, as I said, when you look at it. Let me ask you this. I was just told at the beginning of the other — the argument of the other side that the yearly wage differential, older compared to younger, was $10,000. Is there evidence in the record to that effect? I don't — That that's what they would have introduced? I don't believe there's — I'm not aware of any evidence in the record to that. I certainly don't remember. Either in front of the jury or produced in front of the judges as to why they should have been allowed to say this? I don't believe. Correct me if I'm wrong. Trial counsel is here. Correct me if I'm wrong. But I don't recall there being any kind of such offer of proof. I think it was more of a generalized — they wanted to argue that. There's another important point, by the way. The other side can tell me if there's something in the record that suggests — that tells us that the wage differential is $10,000 a year. But there's another important point, which is there would have been undue confusion caused by getting this information. Two forms of undue confusion and or prejudice. There was a jury instruction that specifically told the jury, you are not to consider whether or not these people got any money. That is an instruction that was never challenged on appeal. So that is agreed and binding on us in terms of that was properly before the jury. So on one hand, we would have had the jury told, you are not to consider whether or not they got any — But they'd already been forbidden from putting on the workers' comp. How could they disagree with the instruction at that point? There wasn't anything to consider. I'm saying, no, they didn't raise that as an issue in this appeal, that that instruction was improperly given. But that would have caused a lot of confusion. Well, but that instruction, it seems to me, is also simply directed at calculation of damages, not as to liability. Because their argument as to workers' comp, they wanted it in because it went to the question of whether or not there was a violation of law. I'm sorry. Please repeat that. I couldn't hear that. Their basic argument as to why they want that workers' comp evidence in is not as to calculation of damages, but rather as to whether or not there's liability in the first place and what their motivation is. But the instruction isn't limited to damages. The instruction says you are not to consider whether or not any payments were made. So the jury would have had instruction that said that and evidence that this guy received 289, and that would have created some kind of terrible mischief. Furthermore, if the evidence came in, then there would have been the danger that we wouldn't have known whether the jury did or didn't factor that into their thinking when they were assessing the damages. So there was a danger of prejudice from that as well. Now, there's nothing in this case, I mean, there's nothing that suggests that this was a rational, planned-out, you know, defense. In other words, there's nothing that suggests that these numbers were discussed and monetized and that the defendants sat down and talked about it and said, well, we're not going to do this because it's going to be too much money. In fact, they denied doing it altogether. So they're kind of, this is an act-of-the-fact creation of how we can get the workers' comp materials in before the jury. But it has nothing, it's creating an appellate issue. I have eight minutes. I don't know whether you want to, well.  Could you turn to the stipulation? Kneedler. Yes. The fundamental problem with what counsel said on the stipulation, well, there's a number of fundamental problems. First of all, he claims that this was a typo or, you know, how can we explain what this was? When you look at the stipulation itself, there's about two or three different places in the stipulation where the same point is made, that defendants are plural, that plaintiffs have no obligation to try to distinguish between the defendants, that both of them were defendants, both of them were the employers of the plaintiffs in this case, et cetera. So there's not a single, you know, oops, we made a typo, defense that can be had. Second of all, it's important to note they never came in and claimed that this was inadvertence. If you look at their arguments. Well, it does appear that it gets used later on for a purpose that was maybe much greater than what they were stipulating to. Because in the jury instructions that the court gives, it begins with several propositions for the jury and tells them that those propositions are stipulated to. And it certainly looks like it then ends up with a proposition that Dr. Pepper was jointly liable, if ABC was liable. And I think that's the way this case was tried, by the way, by defendants. This whole DPSG didn't exist and everything is an appellate afterthought that was not raised at all during the trial. In fact, if you look at the closing statement of defense counsel, he specifically referred, excuse me. It's quoted at ER page 104. This is a memorandum of points and authorities, but it's got cites to the record. Defense counsel, in his closing argument, referred to Mr. Young, the CEO, referred to Mr. Young as, quote, president in the company. I assume he meant president of the company. President in the company. That's the December 5th transcript. And when speaking of his and Mr. Graham's roles in handling the investigation of age discrimination, et cetera. So the lawyers on their side thought that this was basically a single entity. And then tried the case on that theory. And then when the case is over and the post-trial motions are coming in and appellate counsel is able to say, wait a second. Look at this little tidbit we found in the 10K where it says they weren't even existing yet. We can argue, et cetera, et cetera, et cetera. Everybody in this case treated these as a single entity. And the problem with having stipulated in this way, it would leave plaintiff with the obligation to put on evidence of these facts. And that's the whole purpose of a pretrial order. Is to tell plaintiffs what they do have to present evidence on and what they didn't have to. Now, the chronology we have about supposedly this was inconsistent with everything that the defendants did is completely inaccurate. Just the opposite is true. The consistent position the defendants took was that GPSG was a proper defendant in this case. When the complaint was served, they answered it. They didn't immediately try to bring a motion saying you've brought it against somebody who didn't exist or who's got nothing to do with anybody. They then proceeded through the case. They engaged in discovery. They brought a counterclaim. They never brought summary judgment. They never once during the entire history of the case until we got to the final pretrial conference, they never tried to get out of the case. So for them to say now that they, you know, their position from day one was that they didn't belong here, every action they took, other than running in at the last minute with the ex parte request that the stipulation that they had signed be changed, other than that, everything prior to that, their entire course of conduct, was inconsistent with the claim that they didn't think they were a defendant and belonged in the case. Would there have been any other basis for them to have been in the case as a defendant other than being employer? No. No. This is an employment case. And that's the only way they could be is if they were the employer. And basically, as I said, when you read the 10-K in their own language, they say we have been doing this for 30 years. They saw themselves in dealing with the investors and dealing with the SEC, which is regulated by the government, I mean, they saw themselves as a single enterprise. And all the stuff about, well, there's this guy and he's got a title with this company but not with this company, all of that is after the fact. And they also don't mention in their theory why DPSG is sitting there sending instructions. Well, there could be other theories. I mean, there could be an issue of successor liability. There are other theories under which Dr. Pepper might be liable without having to be the employer. But once again. And so there are reasons why they might not have chosen to deny Dr. Pepper's liability or to try to seek Dr. Pepper out of the case if they thought they had successor liability. Well, if they thought they had successor liability, fine. But they basically said we're not going to worry about it. You don't have to worry about it. This court doesn't have to worry about it. We're taking it off the table. We're signing a pretrial order. And there's a fair amount of evidence that does suggest that DPSG is treating itself as really essentially the same company as ABC because, for example, we get an e-mail sent by Ward. He's the guy who says, I don't want to do this because I think it's wrong. He sends it to Larry Young. Now, who's Larry Young? He's the CEO of DPSG, right? He sent something to Graham. He's the vice president of sales for DPSG. So, I mean, we've got these – I mean, if these are truly separate companies, why in the world is he sending it to the CEO of DPSG? So, I mean, you've got evidence in there that suggests these – I mean, I can see why the stipulation would have been entered into. Now, maybe they didn't have to, but the fact that they're not seeking dismissal of DPSG, they're entering into the stipulation makes perfect sense. It seems to me much more than a typo. I couldn't agree more, Your Honor. I don't know whether the Court wants me to address the specific compensatory damage things or not. I mean, I can do that really quickly, or I can go back and visit the other issue, which you seem to have some concern about, which is the workers' comp. So please tell me what you'd rather have me do with my last 1 minute and 25 seconds. The troublesome one to me is the workers' comp, as this is another charge. Okay. It seems to me that with the – it's impossible for me looking at this record. As the judge said, the judge's order said there was an overwhelming amount of direct evidence of discrimination, including by third-party witnesses. Given all of that, it is just impossible. And as I said, there is plenty of information about how much workers' comp in general costs and that they were over budget, so they were free to make all of those arguments. The only thing they couldn't do is say – and furthermore, in this case, there is a $289,000. Do you think we would have done this if we knew we had to pay that? And the answer to that is that would have been confusing and prejudicial for a few different reasons. But even if we forget all that and say, arguendo, it should have come in, it's still hard to see how this could have prejudiced the result. Are we reviewing the district judge's 403 decision for abuse of discretion? I mean, she doesn't say that. But an awful lot of 403 rulings, I mean, they're kind of – they're not greatly detailed. Or because she doesn't say that, do we review on some other less deferential basis? No. I think that basically she made it clear that she believed this was a 403 – that was an independent basis for reaching the same conclusion. And I think the 403 issue should be reviewed in that way. And as I said, the most important thing is if you consider the totality of the evidence in this case, including the – what the judge referred to as the overwhelming – or I forgot the exact adjective – evidence of direct intent, it's hard to believe that had they been able to mention that one number without even showing that they knew that it would – that that would happen. That, like I said, that was a fluke. It's hard to believe that that would have changed the result. And that's really all that matters. Thank you. Thank you very much. And I apologize for the fact that I'm a little unfocused right now. And we as a panel express sympathy to you and your situation. Thank you. Mr. Harris, you've got just not quite two minutes. Luckily, I talk quickly. With respect to the standard review, it is de novo. If you take a look – although it ends up not mattering. If you take a look at the – Standard review of what question? Of the 403, I'm sorry. It ends up being de novo because if you look at her post-trial order, she's operating solely on the premise that it's relevant only to damages. All the comments about confusion and prejudice all relate to damages. She overlooked its relevance to liability. Also as to – This is a smart judge. I have trouble understanding that she would have overlooked it. She was saying that from the get-go, Your Honor. Excuse me. I'm sorry. Did you make the argument to her that you're making to us? Oh, yes. Well, then, she heard it. But if you – Unless she's totally stupid, she understood it and rejected it. But her grounds for – No. She was focused on the damages from the get-go. She said when she first ruled against this, if you tell the jury the company has already paid for this, they're not going to award any damages for things that have already been paid. That was her mindset from the beginning, and that was her mindset all the way throughout. It came up several times during trial, and she kept saying the same thing over and over again. She was very much fixated on that point. With respect to – you asked whether there was any information about the $10,000 differential. It's in our brief, our opening brief at page 22. There are citations there. There is evidence in the record. That it's only a $10,000 differential. That evidence you would have – No, no, no. That was in. That was in. But we weren't allowed to put in any evidence about the amount of the settlements or even the existence of the settlements. We were simply allowed to say we accepted their claims, which the plaintiffs turned around against us and said, well, that shows they knew they were responsible. But it didn't show anything about whether we had any kind of incentive. We know that – in terms of the evidence in front of the jury, we know that the jury knew that the wage differential per year was $10,000. Only $10,000, yes. We know that the various plaintiffs submitted workers' comp claims. Yes. We know that the workers' comp – the jury knew that the workers' comp claims were paid. No. No. There was no discussion that they were paid. Simply that they were accepted. Now, what's the difference between accepted and paid? Accepted doesn't mean anything. Accepted does not mean paid. And actually – What does it mean? It means nothing. It means absolutely – Why do we use – why do you use the word? We didn't use the word. The judge said that was the only thing that the jury could be told. Well, accepted sounds to me like close to paid. Like, okay, if I accept the claim, I'm going to pay the claim. That's not what that word meant to the jury? I have no idea what it means. And it certainly – So the jury was told the claims were accepted. Yes. Whatever that word might mean. Yes. And plaintiffs said that means that we knew we were guilty. It doesn't – it didn't mean anything about payment. But the problem, Your Honor – Were you allowed to say that means paid? No. Did you try to say that means paid? We were told from the get-go that we couldn't. We were told you could only say that it was accepted. You can't say anything else. Here's what the jury knows, though. Let me review the betting. Yeah. That there was a $10,000 wage deferential. Yes. That the older people were being paid. Yes. That these plaintiffs were injured. That these plaintiffs did make workers' comp claims based upon the injury. Yes. And that the claims were accepted. Yes. But we don't – they were not told that they were paid. Right. Nor were they paid any amount that they were paid. Right. And so we – yes. We also knew that you had a budget for paying workers' comp and that in some general sense you'd gone over budget for paying workers' comp in the past. But we were not permitted to put in any kind of – yes. Don't tell me you were not. Yes. But was that last point, that was also in front of the jury? That there was some budgetary information? That they'd gone over budget with workers' comp in the past. I don't know that that was in. I don't recall that being. Okay. We can find out. Okay. Got it. But that's what they knew was subject to possibility of that. But here, the critical point is, plaintiff's entire theory was that we had an incentive to injure these workers. And we were totally – That was not their entire theory. Well, that was an indispensable part of their theory. Part of their theory. Indispensable part. And we were not permitted to put in the evidence that would have shown that it was irrational from our point of view. And because we couldn't put any numbers in, we couldn't put in historical claims. You heard that it was an aberration. We couldn't deal with that. We couldn't tell the jury that a serious claim can cost hundreds of thousands of bucks. We have no incentive to do that. Okay. We got it. Okay. And with respect, very briefly, as to the stipulation, the one point I didn't make, with respect to the way the judge ended up reading the stipulation, even if you end up agreeing that we weren't entitled to be relieved from it, the judge read it as an alter ego stipulation. An alter ego and joint employer are different concepts. Joint employer goes to the question of whether two companies have independent – each have sufficient control over the employment relationship to be statutorily liable. Alter ego is based on a finding of fraud and a merger. And that's why the Andor instructions, which – Well, it requires a merger of the two identities. You've covered this easily well in your book. Okay, thank you. Thank you very much. Thank you. I thank both sides for their arguments. January v. Dr. Prepl Snapper Group, an American bottling company, now submitted for decision.
judges: Tashima, Fletcher, Bybee